Filed 10/22/13  P. v. Diaz CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FRANCISCO JAVIER DIAZ,<br><br>    Defendant and Appellant. | B240979<br><br>(Los Angeles County<br>Super. Ct. No. GA047003) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michael D. Carter, Judge.  Affirmed.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Kenneth C. Byrne and Seth P. McCutcheon, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an amended information filed by the Los Angeles County District Attorney's Office, appellant Francisco Javier Diaz was charged with continuous sexual abuse (count 1; Pen. Code, § 288.5, subd. (a)),[1] lewd acts upon a child (counts 2 and 4 through 6; § 288, subd. (a)), sexual penetration by a foreign object (count 7; § 289, subd. (a)(1)), and forcible lewd acts upon a child (counts 8 through 12; § 288, subd. (b)(1)).  As to all counts, it was further alleged that appellant committed the offense against more than one victim (§ 667.61, subds. (b) & (e)).  Appellant pled not guilty and denied the special allegation.

Trial was by jury.  Appellant was found guilty on all counts.  Probation was denied, and appellant was sentenced to a term of 119 years to life in state prison, calculated as follows:  12 years for count 1; two years for count 2; seven consecutive 15-to-life terms for counts six through 12; and two concurrent 15-to-life terms for counts 4 and 5.  Appellant was awarded 492 days of presentence custody credits, consisting of 428 actual days and 64 days of conduct credit.

Appellant timely appealed.  On appeal, he argues:  (1) The trial court abused its discretion under Evidence Code section 352 by allowing the introduction of evidence of appellant's prior domestic abuse against the mother of one of the victims.  (2) The trial court committed reversible error by refusing to instruct the jury with the lesser included offenses of nonforcible lewd acts upon a minor (§ 288, subd. (b)) in counts 8 through 12.  (3) Insufficient evidence supports appellant's conviction for committing sexual penetration by a foreign object by means of force or fear (count 7; § 289, subd. (a)(1)).  (4) The trial court erred in failing to sua sponte instruct the jury on the lesser included offenses of attempted sexual penetration by a foreign object and assault with intent to commit penetration of the opening of another person by foreign object in count 7.  (5) The admission of Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence violated appellant's rights to due process and a fair trial.  (6) The prosecutor committed misconduct during closing argument by improperly shifting the burden of proof to

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

appellant to prove his innocence. (7) Appellant was improperly sentenced under the one-strike law under the multiple victim circumstance because the jury was not instructed on this circumstance and it was not found true by the jury.

We affirm.

### FACTUAL AND PROCEDURAL BACKGOUND

I. *Prosecution Evidence*

A. <u>The Sexual Abuse</u>

Denise J. (Denise) was born in 1986. When she was four years old, appellant began to date her mother, Myrna D. (Myrna). Appellant started living with Myrna and Denise when Denise was five years old, and the two developed a "father and daughter relationship." In 1995, when Denise was in the fourth grade, appellant "started to look at [her] differently. He also started to go into [her] bedroom at night." At the time, Denise shared a bedroom with her three-year-old half-sister, Melissa D. (Melissa).

The first night that appellant entered Denise's room, Denise woke up "[f]eeling something lightly touching [her] body." Appellant began to move his hand up and down Denise's body "from [her] chest down to [her] private area," increasing pressure as he did so. When appellant noticed that Denise was awake, he ran out of the room. Appellant returned to Denise's room several nights later and "[t]he same thing occurred again." This "caressing" occurred two to three times a week, in the same manner, for two years. Appellant would not allow Denise to lock her bedroom door at night, and Denise would "try to stay awake as much as [she] could." If Melissa woke up while appellant was in the room, appellant would yell at her, pull her hair, and tell her to go back to sleep.

In 1997, at the age of 11, Denise began to go through puberty and her "breasts had gotten bigger." Appellant began "paying more attention to [Denise] than usual." He would put his arm around her and attempted to hug her more often. He told Denise that if she "said something," he "didn't care if [Myrna] got hurt." Denise took this threat seriously.

One night in 1997, after appellant threatened Denise, Denise woke up to screams and yells. Denise witnessed appellant, who appeared drunk, throw a chair at Myrna and

beat her, drawing blood and leaving her with "bruising on her face" and a broken nose. The police were called and appellant was arrested and gone from the home for "two to three months."

In the Spring of 1998, appellant returned to the family home. Appellant, Denise, Melissa, and Myrna moved to a new house in Monterey Park. Denise continued to share a bedroom with Melissa and appellant continued to go into their bedroom at night and touch Denise. After getting evicted, appellant, Denise, Melissa, and Myrna moved again. Appellant's pattern of touching Denise in her room at night did not change.

Appellant began taking Denise on "errands" with him during the day, once or twice a week. When appellant would take her on these errands, he would drive the two of them around. The first time, appellant drove Denise to a CVS store parking lot, where he "leaned over and . . . tried to kiss [her]." Appellant tried to "put his hand into [Denise's] shirt" as she pushed him away and attempted to fight back. On another occasion, appellant again attempted to kiss and touch Denise while stopped in a parking lot; Denise struggled with appellant and he stopped.

Once, after returning home from yet another errand, appellant became very aggressive with Denise in the parking lot at their apartment complex. As she began to exit his vehicle, appellant "pulled [her] down and then [appellant] got on top of [her]." He tried to kiss her and "was shoving his hand under [her] shirt." Appellant tried to get his hand under Denise's bra as she yelled and screamed. Denise struggled with appellant and was able to get away and run inside her apartment.

Normally, appellant only took Denise out on errands. But, on one occasion, Melissa was also in the vehicle. He took the two children to a doughnut shop and parked in the parking lot. As soon as the engine turned off, appellant took off his seatbelt and jumped over towards Denise and tried to kiss her, touching her as he did so. He also attempted to shove his hand under Denise's shirt. As Denise tried to push appellant away, Melissa yelled for appellant to stop. Appellant stopped and when they returned to the apartment, Melissa told Myrna that appellant had been "wrestling" with Denise in the car. Myrna asked Denise if it was true, and Denise started crying and left the room.

4

Then, appellant and Myrna argued; appellant got on his knees and said it was not true. After this incident, appellant stopped taking Denise on errands for a while, but still continued going into her room.

Toward the end of Denise's year in eighth grade, appellant started giving Denise money once or twice a month. On one occasion, after Myrna saw appellant give Denise $20, Myrna was upset because he had not been giving her anything; she took the money away from Denise and gave it back to appellant. When Denise left the room, appellant slapped Myrna and told her that what he gave to Denise was none of her business.

In 2000, Denise began high school. Sometime around the beginning of the school year, Denise invited her high school friend, Jennifer B. (Jennifer) to spend the night. Melissa slept with Denise on the pull out couch bed and Jennifer slept on the twin bed.

Jennifer was awakened by "a sharp pain . . . in [her] vagina." Jennifer "realized later it was [appellant's] finger" that had caused the pain. When she tried to get up, appellant put his hand over her mouth and "forcefully put [her] back down on the bed." As Jennifer struggled, appellant attempted to pull down her shorts. He held a pillow over Jennifer's face as he tried "to wiggle his body in between [her] legs." Appellant flipped Jennifer onto her stomach and began to "rub [her] butt." Jennifer was finally able to push appellant off of her, waking Denise. Denise saw appellant standing in front of Jennifer and yelled, "'What the fuck [is] going on?'" Melissa heard Jennifer screaming, "'He touched me. He touched me.'" After Jennifer yelled at appellant to get away, appellant ran out of the room. Jennifer found her own menstrual blood on her neck, arm, and legs.

Denise grabbed Melissa and Jennifer, took them quickly into her aunt's bedroom, and went to her mother's room. Denise told Myrna that appellant was in her room where Jennifer was sleeping. When Myrna asked Jennifer what had happened, she said that appellant had gone into the room, sat at the end of the bed, and asked where Denise was.

Appellant, who appeared drunk, barged through Myrna's door. After Denise left the room, Myrna asked appellant why he was on the end of the bed looking for Denise. Appellant did not respond.

5

Melissa then spoke with appellant in Myrna's room. Appellant pulled her close to him, cried, and repeatedly said that he was sorry. When she asked what he was sorry for, appellant said that he thought it was her in the bed. Melissa responded, "'If you thought it was me, then you were going to touch me.'" Appellant continued to cry, but did not respond to this statement.

Jennifer and Denise then went into the living room and heard Myrna yelling at appellant in Spanish. Jennifer told Denise that appellant had tried to touch her, but provided no other details. Denise and Jennifer then went outside and Denise told Jennifer that appellant had touched her as well. When asked why she had not told anyone, Denise said that she was afraid that she would be separated from her mother and sister. Jennifer told Denise that when she was ready to speak up, Jennifer would also speak up.

A short time after this incident, Denise and Myrna were called to a meeting with the school counselor. The counselor said that she had received a phone call that Denise was being abused at home. Myrna was shocked and asked Denise if it was true. Denise denied the allegations. Jennifer was also called into the counselor's office, was asked about the alleged touching incident, and denied that it had occurred.

In 2001, appellant was kicked out of the family house. Shortly thereafter, Denise told Myrna what appellant had been doing to her. When Myrna asked why Denise had never told her, Denise replied because appellant kept beating Myrna and had threatened her that he would beat Myrna more.

Myrna then called appellant's sister, Alma M. (Alma), and told her what appellant had done. She told Alma that appellant was going to jail, and then she hung up the phone and called the police.

In the meantime, appellant was at the house playing with Melissa. Alma showed up, said something about the police, and screamed at appellant to get into the car; appellant ran into the car and left. Appellant fled to Texas.

B. Appellant Returns to California

Ten years later, in 2011, Los Angeles County Sheriff Detective Mark Shaughnessy learned that appellant was receiving government financial aid and that the checks were

6

going to Alma's address. Along with other officers, he went to that address, found appellant, and took him into custody.

C. CSAAS Evidence

Dr. Mitchell Eisen testified about CSAAS. CSAAS helps explain why some children react the way that they do after incidents of sexual abuse. CSAAS also explains delayed reporting in cases of child abuse.

II. *Defense Evidence*

Appellant testified on his own behalf. Denise is his stepdaughter. He had "problems" with her and she would not listen to him when he attempted to discipline her. She called him "retarded." At night, appellant would occasionally enter the bedroom that Denise shared with Melissa and appellant's son. Once inside the bedroom, appellant "watched them. [He would] put the blanket on them. Sometimes Denise would be a little bit disheveled on the bed. [Appellant] would straighten it out and put the blanket on her." He never molested Denise and never touched her on her breasts or over her vagina. After appellant moved to Monterey Park, he stopped checking on the girls at night.

Myrna asked appellant to discipline Denise when she would miss school or when she stayed out late with her boyfriend. He took Denise along on errands, but never attempted to kiss or touch her. He remembered when Jennifer spent the night. That night, he entered Denise's bedroom, "tucked [Melissa] in, then [he] walked around the room. [Appellant] fell. Then the light went on and [appellant] was puzzled." When he fell, his hand landed on Jennifer's thigh. He left the room and asked Myrna who was in the bedroom with Denise and Melissa, but Myrna did not tell him.

Appellant's brother-in-law testified that he never noticed anything unusual about the way appellant and Denise interacted.

Riverside County Deputy Sheriff Patrick Larson testified that he was a deputy sheriff for Los Angeles County in 2001. He interviewed Denise on July 31, 2001. She told him that appellant "started molesting her around the age of nine with the last incident occurring when she was age 13, September of 1999."

7

In 2001, appellant moved to Texas because he had a warrant out for his arrest in California. He lived in Texas for five years.

## DISCUSSION

I. *Admission of Evidence of Prior Domestic Violence*

Appellant contends that his conviction must be reversed because the admission of evidence of his prior domestic violence against Myrna was erroneous. Specifically, he argues that the prior act was "irrelevant to the charged offenses against Denise, was prejudicial, and requires reversal of appellant's convictions."

A. <u>Relevant Proceedings Below</u>

Prior to trial, there was a lengthy discussion about the admissibility of evidence concerning domestic violence and physical abuse against Myrna while Denise was in seventh grade. The prosecutor argued that the evidence was admissible to establish forcible lewd acts on a child by the use of force, duress, menace, or fear. Appellant's trial counsel argued that the evidence was irrelevant to what he did to Denise or Jennifer and should be excluded under Evidence Code section 352 as unduly prejudicial. The trial court found the evidence "relevant to [Denise's] state of mind regarding the force or fear elements in the charges" and admitted the evidence.

The following evidence was admitted: Denise testified that she never told anyone about appellant's actions because she was "scared to say something" after she had witnessed her mother "being abused." This particular incident occurred while she was in the seventh grade: She remembered waking up to appellant and Myrna "yelling and screaming." Appellant threw a chair at Myrna and then "started beating her." Myrna was left bloody, bruised, and with a broken nose. Ultimately, appellant was arrested and was absent from the home for a few months.

Denise further testified that at around the time of the assault on her mother, appellant threatened Denise with more violence if she told anyone about the sexual abuse. Denise stated that, based on appellant's threats and the past violent attack on her mother, she was scared and "didn't know how far [appellant] could take his violence towards [Denise and Myrna]."

8

Myrna also testified about appellant's assault, corroborating Denise's earlier testimony. Denise also told her mother that she never told anyone about appellant's sexual abuse because she did not want appellant to beat her mother again.

B. Relevant Law

Among other things, appellant was charged with violating section 288, subdivision (b)(1), which provides, in pertinent part: "Any person who commits an act described in subdivision (a) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, is guilty of a felony and shall be punished." "[D]uress involves psychological coercion. [Citation.] Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes." (*People v. Senior* (1992) 3 Cal.App.4th 765, 775.) "'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress." (*Ibid*.) And when sex acts are committed on a child by a parental authority figure "against a background of . . . violence, . . . the circumstances [may] suggest[] an implied threat of harm" if the victim fails to submit. (*People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1580.)

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) A trial court's exercise of its discretion will not be disturbed "'*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Ibid*.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an

emotional bias against defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, 'prejudicial' is not synonymous with 'damaging.'" (*People v. Yu* (1983) 143 Cal.App.3d 358, 377.)

### C. Analysis

Here, the evidence of appellant's prior violent act against Myrna, which was witnessed by Denise and used as a constant reminder of what would happen if she reported appellant's abuse, was admissible to prove the force, fear, or duress element of the charged crimes. (*People v. Wilkerson*, *supra*, 6 Cal.App.4th at p. 1580.) This evidence established that Denise feared appellant and submitted to his acts without alerting another person because she was afraid that he would hurt her or her mother.

This evidence was not overly inflammatory as it pertained exactly to an element of the crimes charged. And, there was no probability of confusing the jury; a jury could easily segregate the charged crimes of sexual abuse from the evidence of prior domestic violence. Furthermore, the prior act of domestic violence occurred at the same time appellant was sexually abusing Denise. Last, the introduction of this evidence was brief and did not waste time. (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.) Appellant was painted faithfully for the jury. (*Ibid*.) It follows that the trial court did not abuse its discretion in admitting this evidence.

### D. No Prejudice

Even if the trial court had erred in admitting this evidence, any error was harmless. It is not reasonably probable that an outcome more favorable to appellant would have occurred had the evidence been excluded. (*People v. Falsetta* (1999) 21 Cal.4th 903, 924–925.)

The main contested issue in this case was the credibility of the victims and witnesses involved in the current offenses, and they gave clear, detailed, and credible testimony regarding appellant's actions. Denise was unwavering in her testimony regarding the ongoing and unwanted physical advances by appellant, especially while "run[ning] errands." Bolstering her testimony was the testimony from Melissa, who confirmed appellant's forceful interaction with Denise in appellant's car.

10

Moreover, the testimony regarding the prior act was very brief and the jury was given a limiting instruction. Contrary to appellant's suggestion that the limiting instruction was ineffective, we presume that the jury followed this limiting instruction. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

In urging us to reverse, appellant focuses on the prosecutor's remarks during closing argument and claims that this evidence persuaded the jury that appellant committed the charged offenses. We cannot agree. As set forth above, the evidence of appellant's continuous sexual abuse was overwhelming. The only reasonable conclusion is that the jury based its convictions upon the evidence of appellant's sexual abuse of Denise and Jennifer, not upon the minimal evidence of the prior domestic violence of Myrna.

Because appellant would have been convicted even without the evidence of the prior domestic violence, any alleged error in admitting this evidence was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

II. *Declined Instruction on Lesser Offense of Nonforcible Lewd Acts Upon a Minor (Counts 8 through 12)*

Appellant contends that the trial court erred by failing to instruct on nonforcible lewd acts upon a minor as a lesser included offense of forcible lewd acts upon a minor.

A. Proceedings Below

During the jury instruction conference, the trial court decided to instruct the jury with the lesser included offense of battery (§ 242) as to all counts, but refused to instruct the jury with nonforcible lewd acts (§ 288, subd. (a)), as lesser included offenses to forcible lewd acts (§ 288, subd. (b)) in counts 8 through 12. In so ruling, the trial court reasoned that there was insufficient evidence to support this instruction.

B. Relevant Law

""""It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citation.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are

11

necessary for the jury's understanding of the case.' That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' [Citations.]" [Citations.]'" (*People v. Pitts* (1990) 223 Cal.App.3d 606, 883, superseded by statute on other grounds as stated in *People v. Levesque* (1995) 35 Cal.App.4th 530, 536–537.)

"Instructions on lesser included offenses need only be given 'if the accused proffers evidence sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded'" that the particular facts underlying the instruction did exist. [Citations.]'" (*People v. Pitts*, *supra*, 223 Cal.App.3d at p. 883.) "The trial court is not obligated to instruct *sua sponte* on necessarily included offenses unless the evidence would justify a conviction of such offenses." (*People v. Wickersham* (1982) 32 Cal.3d 307, 325, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201.)

    C. <u>No Evidence Supported Instruction on Lesser Included Offense</u>

Here, the evidence did not support an instruction on the lesser included offense of nonforcible lewd acts upon a child (as opposed to forcible lewd acts upon a child). *People v. Pitts*, *supra*, 223 Cal.App.3d 606 is instructive. In that case, the trial court and trial counsel considered whether there was a sua sponte duty, under the evidence presented, to instruct on section 288, subdivision (a), as a lesser included offense of section 288, subdivision (b). (*People v. Pitts*, *supra*, at p. 883.) Because defense counsel had not requested such an instruction and the defense's theory did not involve the commission of a violation under subdivision (a) as opposed to subdivision (b) of section 288, the trial court found no sua sponte duty to give the instruction. (*People v. Pitts*, *supra*, at pp. 883–884.) The Court of Appeal affirmed, finding that the failure to give an instruction under subdivision (a) was not error. (*Id*. at p. 884.) In so finding, the Court of Appeal recognized that the defendants had denied any part in the molestations—either they were misidentified or the victims were lying. (*Ibid*.) In other words, "[i]f the

12

People's evidence were believed, [the defendants] were guilty as charged. If the defendants' evidence were believed, they were not guilty of anything." (*Ibid*.) Thus, under no view of the evidence was any of the defendants guilty of nonforcible molestation pursuant to section 288, subdivision (a). (*Ibid*.)

The same analysis applies here. If the People's evidence were believed, then appellant was guilty as charged; if appellant's evidence were believed, then he was not guilty of anything. Thus, there was no sua sponte duty to instruct on the lesser included offense of nonforcible lewd acts upon a child.

Appellant claims that Denise's testimony, particularly when considered in light of appellant's denial of wrongdoing and Melissa's testimony that she did not see any molestation, could have supported the lesser included offense. But, Melissa's testimony confirms that Denise had to fight appellant off, thereby establishing force.

Appellant's reliance upon *People v. Hecker* (1990) 219 Cal.App.3d 1238, disapproved in part by *People v. Soto* (2011) 51 Cal.4th 229, 248, footnote 12, is misplaced. In that case, a sexual abuse victim testified that she was not in fear of the defendant and that he had never used physical force. (*Id*. at p. 1250.) Further, there was no evidence that he had threatened the victim. (*Ibid*.) In contrast, as set forth above, there was ample evidence of physical contact between appellant and Denise while in his car and that she would "fight back." And, Denise testified that she was afraid of appellant and that appellant had threatened her.

D. Any Assumed Error was Harmless

As set forth above, there was strong evidence of appellant's sexual abuse of Denise. Thus, even if the trial court erred in failing to instruct the jury on the lesser included offense of nonforcible lewd acts, it is not reasonably probable that he would have received a more favorable result. It follows that any alleged error was harmless. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

III. *Sufficient Evidence on Count 7*

Appellant contends that his conviction for sexual penetration by a foreign object in count 7 was not supported by substantial evidence. Specifically, he claims that "there was insufficient evidence to establish the requisite element of penetration."

A. <u>Relevant Law</u>

On appeal, a reviewing court must review the entire record in a light favorable to the judgment below and determine whether substantial evidence supports the conclusion of the trier of fact that the prosecution sustained its burden of proving each element of the crime. (*People v. Kelly* (1992) 1 Cal.4th 495, 528.) "Substantial" evidence is evidence of "preponderable legal significance reasonable in nature, credible, and of solid value. To be 'substantial,' the evidence must reasonably inspire confidence." (*People v. Morris* (1988) 46 Cal.3d 1, 19, disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5 & 545, fn. 6.) Only by a clear showing that ""'on no hypothesis whatever is there sufficient substantial evidence to support the verdict'"" will a conviction be reversed. (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1329.) A reviewing court's function is not to resolve credibility issues or evidentiary conflicts. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "If the circumstances reasonably justify the jury's finding as to each element of the offense, the judgment may not be overturned when the circumstances might also reasonably support a contrary finding." (*People v. Lewis* (2001) 25 Cal.4th 610, 643–644.)

B. <u>Analysis</u>

Here, appellant was charged with forcible sexual penetration by a foreign object (§ 289, subd. (a)(1)), requiring the jury to find that he committed the act of "sexual penetration" against Jennifer. As defined in section 289, subdivision (k)(1), "sexual penetration" is "the act of causing the penetration, however slight, of the genital or anal opening of any person . . . for the purpose of sexual arousal." Any "'foreign object,' . . . include[s] any part of the body . . . ." (§ 289, subd. (k)(2).)

Jennifer described appellant's criminal conduct in detail at trial. She was awakened to a "sharp pain in . . . [her] vagina." When asked what had caused the pain,

Jennifer said that it was appellant's finger.  She also testified that appellant placed his hand over her mouth and, after struggling free from appellant, she found her own blood on her neck, arm, and legs.  The origin of the blood was Jennifer's vagina.  Based upon this evidence, it was reasonable for the jury to conclude that appellant's finger had penetrated Jennifer's vagina.  (§ 289, subd. (k)(1); *People v. Harrison* (1989) 48 Cal.3d 321, 328.)

IV. *Declined Instruction on Lesser Offense of Attempted Sexual Penetration by a Foreign Object*

Appellant argues that the trial court erred by failing to instruct the jury on attempted sexual penetration as a lesser offense to sexual penetration.

For the same reasons set forth above, the trial court did not err.  There was no evidence to support appellant's theory that he merely attempted to sexually penetrate Jennifer; rather, appellant's theory at trial was a complete denial of any wrongdoing. (*People v. Friend* (2009) 47 Cal.4th 1, 52 [either the defendant committed the greater offense or none at all].)  Because there was no evidence to show that appellant made a direct, but ineffectual, act toward the completion of the charged offense, but was interrupted or unable to complete the act, he was not entitled to an instruction on the lesser offense.  (*People v. Rundle* (2008) 43 Cal.4th 76, 143, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 417–418.)

It follows that even if the trial court erred by declining to give this instruction, that error was harmless.  Again, there was ample evidence to support the greater offense.  In light of that evidence, it is not reasonably probable that the jury would have reached a more favorable result to appellant.

V. *Expert Testimony on CSAAS*

Appellant contends that the admission of expert testimony on CSAAS was improper and prejudicial because it served to "add weight to Denise and Jennifer's testimony by having an expert testify [that their] behavior conformed to the behavior of sexually abused minors."  Further, appellant complains that the CSAAS evidence

"enhanced [the victims'] credibility and provided the jury with a way to credit their accusations of sexual abuse and to discredit appellant's denial."

### A. Proceedings Below

During trial, before Dr. Eisen was called to testify, the trial court discussed his proposed testimony with counsel outside the presence of the jury. The prosecutor indicated that Dr. Eisen would testify about CSAAS, particularly why there are delays before people disclose abuse. The prosecutor also wanted Dr. Eisen to offer a historical perspective on CSAAS. Defense counsel was concerned about being able to cross-examine the expert about the "limitations and shortcomings of this syndrome." The trial court responded that the defense would be permitted to "cross-examine on any issue that they feel is important." Then the trial court stated: "So with that, as long as there are no discussions or opinions about this particular witness and an opinion as to whether or not this particular victim was assaulted or an opinion as to whether this particular victim is telling the truth, I think that the testimony is admissible. [¶] And there are numerous cases that talk about it, and I think we already talked about [*People v. Patino* (1994) 26 Cal.App.4th 1737,] which [discusses] limitations of it. With that in mind, I am going to allow it."

### B. Forfeiture

As set forth above, appellant's trial counsel raised concerns about the ability to cross-examine Dr. Eisen on CSAAS. But, he never objected to the admissibility of the evidence on the basis that it was improper or wrongly corroborated Denise and Jennifer's testimony. Accordingly, appellant has forfeited that claim on appeal. (*People v. Geier* (2007) 41 Cal.4th 555, 609; Evid. Code, § 353, subd. (a).) Our analysis could stop here.

### C. CSAAS Testimony was Properly Admitted

For the sake of completeness, we turn to the merits of this issue. A trial court's admission of expert testimony is reviewed for an abuse of discretion. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

16

"[I]t has long been held that in a judicial proceeding presenting the question of whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396, 418.) Carefully tailored CSAAS evidence is admissible to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301.) "The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394.)

Here, the CSAAS evidence was offered for the exact reason it exists—Dr. Eisen explained that Denise's behavior conformed to the behavior of sexually abused minors. In other words, her delayed disclosure was consistent with CSAAS. (*People v. Patino*, *supra*, 26 Cal.App.4th at p. 1742.) And, the jury was instructed on the use of Dr. Eisen's testimony regarding CSAAS: It was told that Dr. Eisen's testimony about CSAAS was "not evidence that [appellant] committed any of the crimes charged against him." And, the jury was instructed that it could use Dr. Eisen's testimony to "decid[e] whether or not [Denise's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of [her] testimony."

Contrary to appellant's suggestion that Dr. Eisen testified regarding Denise's credibility, he expressly stated that he did not interview Denise, that he could not comment on whether her memory was "likely right or wrong", and that his testimony had nothing to do with the facts or allegations against appellant. Because this was the proper way to testify regarding CSAAS evidence, the trial court did not err in admitting it.

D. No Prejudice

Even if the trial court erred in admitting Dr. Eisen's CSAAS testimony, appellant was not prejudiced by the alleged error. At the risk of sounding redundant, the evidence against appellant was overwhelming. And, Dr. Eisen made clear that the CSAAS evidence was not intended to show that appellant abused Denise. Further, the trial court

17

instructed the jury as to the testimony's limited admissibility. When all of the circumstances are considered, it is not reasonably probable that appellant would have received a more favorable verdict had Dr. Eisen's testimony been excluded. (*People v. Housley* (1992) 6 Cal.App.4th 947, 959.)

VI. *Prosecutorial Misconduct*

Appellant argues that the prosecutor committed misconduct when he referred to appellant's flight in closing argument. Specifically, he claims that the prosecutor shifted the burden of proof when he stated that flight was "something that an innocent person wouldn't do."

A. Applicable Law

Regardless of subjective intent, a prosecutor commits misconduct if he uses """"""deceptive or reprehensible methods to attempt to persuade either the court or the jury.""""""" (*People v. Hill* (1998) 17 Cal.4th 800, 819.) When attacking a prosecutor's remarks to a jury, a defendant must show a "'reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*People v. Gurule* (2002) 28 Cal.4th 557, 657.)

The appellate court must """"not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Gurule*, *supra*, 28 Cal.4th at p. 657.) A prosecutor violates federal due process only if his comments are """"so egregious that [they] infect[] the trial with such unfairness as to make the conviction a denial of due process."""" (*People v. Ayala* (2000) 23 Cal.4th 225, 283–284.)

B. Analysis

In the trial, the prosecutor did not commit misconduct by commenting on appellant's flight in his closing argument. There is no dispute that appellant was a fugitive for 10 years after he fled California upon learning that charges had been made

against him.  Moreover, the jury was rightly instructed with CALCRIM No. 372,[2] which creates a permissible inference, rather than a mandatory presumption, and thus does not impermissibly shift the burden of proof.  (See *People v. Avila* (2009) 46 Cal.4th 680, 710 [a flight instruction does not create an unconstitutional permissive inference or lessen the prosecutor's burden of proof].)  The same can be said of the prosecutor's comments; he had every right to refer to appellant's flight in closing argument and he properly invited the jury to consider it as conduct that could have shown appellant's awareness of guilt.

        C.  <u>Any Alleged Error was Harmless</u>

Even if the prosecutor did err, that one isolated incident did not infect the entire trial with unfairness; appellant has not shown prejudice in light of the record as a whole.  (*People v. Sanders* (1995) 11 Cal.4th 475, 527.)  The jury was instructed with CALCRIM No. 372, which guided the jurors on how to consider the evidence of flight.  The trial court also instructed the jury that "if you believe that the attorneys' comments on the law conflict with [the court's] instructions, [then the jury] must follow [the court's] instructions."  The trial court's instructions, not the prosecutor's argument, are determinative, for we presume that "jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade."  (*People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8.)  Given the instructions here, there is no reasonable likelihood that the prosecutor's statements would have misled the jury or that a different result would have occurred.  (*Id*. at p. 663.)

VII.  *Sentencing*

Appellant contends that he was improperly sentenced under the One Strike law (§ 667.61, subds. (b) & (e)) due to a "failure to comply with the express pleading requirement of section 667.61," because the jury was not instructed on this circumstance, and because the circumstance "was not found true by the jury."  In so urging, appellant

---

[2]    The jury was instructed:  "If the defendant fled after he was accused of committing the crime, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled cannot prove guilt by itself."

relies heavily upon *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*). But *Mancebo* has nothing to do with the issues in this case. The *Mancebo* court considered the express pleading requirement of section 667.61 and held that the defendant's due process right had been violated because the special allegation (§ 667.61, subd. (e)(5)) had never been expressly alleged in the information. (*Mancebo*, *supra*, at p. 743.) In contrast, here, the special allegation was pled in the amended information.

To the extent appellant suggests that reversal is required because the jury did not make a special finding as to the multiple victim allegation, we are not convinced. Section 667.61, subdivision (i), only requires the trier of fact to determine that the crime was committed against multiple victims; the statute does not specifically compel an additional special finding. (*People v. Jones* (1997) 58 Cal.App.4th 693, 710–711.) When the jury returned a guilty verdict on counts relating to both Jennifer (count 7) and Denise (counts 1, 2, 4-6, and 8-12), it necessarily determined that there was more than one victim. This factual issue was necessarily resolved adversely to appellant. (*Id.* at pp. 711–712.)

It follows that even if the trial court erred in neglecting to give the jury a special verdict form for the multiple victim circumstance, that error was harmless. (*Mancebo*, *supra*, 27 Cal.4th at p. 728; *People v. Jones*, *supra*, 58 Cal.App.4th at p. 711; *People v. Marshall* (1996) 13 Cal.4th 799, 850.)

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
    ASHMANN-GERST

We concur:

_____, P. J.
    BOREN

_____, J.
    CHAVEZ